ROBBIE A. CASH, Employee, Plaintiff-Appellee v. LINCARE HOLDINGS, Employer, TRAVELERS INSURANCE COMPANY, Carrier, Defendants-Appellants

No. COA06-77

(Filed 2 January 2007)

**1. Workers' Compensation— possibility of future medical treatment—appeal not interlocutory**

An appeal from a workers' compensation case involving payment for medical treatment was not interlocutory even though defendant argued that other hearings on the same issue were possible in the future. The Commission's order resolved all issues surrounding the disputed treatment and did not contemplate further hearings. The fact that the order did not determine wage compensation did not render the appeal interlocutory; the determination of medical compensation is separate from the determination of disability compensation.

**2. Workers' Compensation— emergency treatment—compensable—binding findings supporting conclusions**

Industrial Commission findings in a workers' compensation case were deemed binding where the assignments of error were not supported by arguments in the brief. The findings supported conclusions that the medical treatment received by plaintiff was reasonably necessary for an emergency, and that defendants must pay for treatment given at specific times. N.C.G.S. § 97-25.

Appeal by Defendants from opinion and award entered 8 September 2005 by the North Carolina Industrial Commission. Heard in the Court of Appeals 21 September 2006.

*Michael E. Mauney; and Rigsbee & Cotter, P.A., by William J. Cotter, for Plaintiff-Appellee.*

*Hedrick Eatman Gardner & Kincheloe, L.L.P., by Sharon E. Dent, for Defendants-Appellants.*

McGEE, Judge.

Defendants appeal from an opinion and award of the North Carolina Industrial Commission (the Commission) filed 8 September 2005, affirming a Deputy Commissioner's decision awarding Plaintiff medical treatment pursuant to N.C. Gen. Stat. § 97-25. Plaintiff also filed a motion to dismiss this appeal as interlocutory.

## I. Facts

Robbie A. Cash (Plaintiff) was injured in a motor vehicle collision on 8 October 2001, while Plaintiff was employed as a respiratory therapist for Defendant Lincare Holdings, Inc. (Lincare). Plaintiff was taken to the emergency room at Duke University Medical Center and was admitted for three days. The emergency room report stated that Plaintiff "complained of pain to the belly and to the neck and back." Plaintiff also had difficulty urinating. Lincare admitted compensability by filing a Form 60 on 11 February 2002 and began paying Plaintiff's medical expenses and weekly wage compensation.

After the 8 October 2001 accident, Plaintiff sought follow-up care with Dr. Robert Wilson (Dr. Wilson) and Dr. Thomas Dimmig (Dr. Dimmig), with Triangle Orthopaedics, for his spine and neck injuries, and with Dr. Robert Andrews (Dr. Andrews) for his urination dysfunction. After medication failed to correct Plaintiff's urination problem, Dr. Andrews opined that Plaintiff's "voiding problems [were] secondary to his primary spine injury and treatment of the primary spine injury should not be delayed." Plaintiff returned for a follow-up appointment on 20 March 2002 and Dr. Andrews reiterated that "ultimate improvement will require identification and treatment of his underlying spinal pathology." After Plaintiff's initial appointment with Dr. Dimmig, Lincare arranged for Plaintiff to be treated by Dr. Scott Sanitate (Dr. Sanitate) of the Carolina Back Institute.

Plaintiff saw Dr. Sanitate on 13 December 2001 and reported numbness in his upper and lower extremities, incontinence, difficulty swallowing, and cervical and lumbar pain. Plaintiff reported he felt most of his discomfort on his left side. Plaintiff saw Dr. Sanitate again on 17 January 2002. Despite Plaintiff's reluctance, Dr. Sanitate released Plaintiff to return to work, with no lifting greater than twenty-five pounds. Plaintiff moved for a Change of Treating Physician to return to the care of Triangle Orthopaedics, which was granted by the Industrial Commission.

Dr. Dimmig assumed Plaintiff's care once again, and performed lumbar decompression and fusion surgery on Plaintiff's back on 26 March 2002. As a result of the surgery, Plaintiff reported improvement in his back pain and in his ability to urinate, though he continued to complain of significant pain in his neck, left shoulder, and in his left knee.

After the 8 October 2001 accident, Plaintiff also developed difficulty swallowing liquids. The physician treating Plaintiff for this

problem referred Plaintiff to a neurologist, and Plaintiff began seeing Dr. Jeffrey Siegel (Dr. Siegel). Plaintiff reported daily headaches, muscle spasms, and continued swallowing problems. Plaintiff continued seeing both Dr. Dimmig and Dr. Siegel.

Dr. Dimmig performed an additional surgery on Plaintiff's neck on 16 July 2002. After the surgery, Plaintiff developed numbness around his neck, hands, and right leg, and weakness in his left arm. He continued to experience difficulty swallowing. Plaintiff returned for a follow-up visit with Dr. Dimmig and complained of increased right leg pain. Dr. Dimmig ordered an MRI. Plaintiff's MRI was "satisfactory" and on 20 December 2002, Dr. Dimmig concluded that "other interventional treatment [was not] necessary." On 17 January 2003, Dr. Dimmig stated that Plaintiff "[was] reaching maximum medical improvement" and Dr. Dimmig would consider discharging Plaintiff with permanent restrictions when Plaintiff returned for his next follow-up in approximately one month. After ordering a functional capacity evaluation, Dr. Dimmig concluded that Plaintiff required sedentary-type work and was unable to work a four-hour or eight-hour day. At Plaintiff's 11 April 2003 visit, Dr. Dimmig found Plaintiff to be at maximum medical improvement, concluded that Plaintiff could work a four-hour to eight-hour work day in a sedentary-type job, and discharged Plaintiff.

Plaintiff continued seeing Dr. Siegel for neurological care, and in a follow-up note dated 6 March 2003, Dr. Siegel indicated that Plaintiff was upset at being "abruptly released" from care by Dr. Dimmig. Dr. Siegel suggested that Plaintiff seek additional orthopedic care with another orthopedic surgeon. Dr. Siegel noted on 11 April 2003 that Plaintiff would be at maximum medical improvement neurologically "very shortly" but that Plaintiff "was not yet there." After reviewing the results of Plaintiff's functional capacity evaluation, Dr. Siegel felt that Plaintiff was totally disabled and unable to work even four hours at a time. Dr. Siegel noted on 9 May 2003 that Plaintiff thought he needed a second opinion for ongoing left knee and left arm pain since he had been discharged from Dr. Dimmig's care, and Dr. Siegel agreed. Dr. Siegel concluded that Plaintiff was at maximum medical improvement with the exception of Plaintiff's orthopedic problems.

Plaintiff filed a motion to compel Lincare's insurance carrier, Travelers Insurance Company (Travelers), to authorize the medical treatment recommended by Dr. Siegel on 2 June 2003. Plaintiff saw Dr. Siegel again on 23 June 2003 and 25 July 2003, and complained of being "jerked . . . around" by Travelers. Dr. Siegel recommended,

*inter alia*, psychological or psychiatric care for Plaintiff for increased depression and anxiety, follow-up orthopedic care, and follow-up neurological care, which Travelers refused to authorize. By letter, Travelers instructed Dr. Siegel to restrict his care to treatment of Plaintiff's swallowing dysfunction and headaches, and not to treat any psychiatric conditions or back problems.

While Plaintiff was waiting for the Commission to rule on his motion to compel, Plaintiff's five-year old son was involved in a bicycle accident. Plaintiff felt that as a result of his ongoing injuries, he was unable to assist his son and decided to "take [his] health into his own hands." Plaintiff sought treatment from Dr. Paul Suh (Dr. Suh), an orthopedic surgeon at the North Carolina Spine Center, on 15 July 2003. Dr. Suh referred Plaintiff to Dr. Andrew Jones (Dr. Jones) for Plaintiff's shoulder and knee problems. Dr. Suh treated Plaintiff for continued low back pain and started Plaintiff on physical therapy.

In an administrative order dated 21 July 2003, the Commission granted Plaintiff's motion to compel, and ordered Travelers to authorize and pay for Plaintiff's treatment as recommended by Dr. Siegel. Neither Lincare nor Travelers appealed this order. Under Dr. Suh's care, Plaintiff underwent a lumbar myelogram and CT scan on 12 September 2003, which revealed mild degenerative disc disease. Dr. Suh also stated that Plaintiff might benefit from removal of a "pedicle screw" to alleviate thigh pain. Dr. Jones gave Plaintiff a corticosteroid injection in his left shoulder and recommended knee surgery be performed by Dr. Clifford Wheeless (Dr. Wheeless). Dr. Wheeless operated on Plaintiff's left knee on 1 October 2003, and found several knee injuries, including a meniscus tear.

Plaintiff filed a motion to compel payment for the treatment provided by Drs. Jones, Suh, and Wheeless on 4 September 2003. In an administrative order dated 22 September 2003, the Commission denied Plaintiff's motion, but "noted that [D]efendants shall continue compliance with the medical order entered July 21, 2003." Dr. Siegel wrote prescriptions for Plaintiff to receive treatment by Drs. Jones, Suh, and Wheeless on 24 September 2003.

Travelers ultimately approved Plaintiff to obtain a psychological evaluation as recommended by Dr. Siegel, and Plaintiff saw Dr. Robert Arne Newman (Dr. Newman). Dr. Newman stated that Plaintiff suffered from conversion disorder, which leaves affected individuals "vulnerable to developing physical symptoms in response to stress" and "an unrealistic interpretation of physical signs or symptoms[.]"

Plaintiff filed a motion to reconsider, which the Commission denied. Plaintiff appealed the administrative decision and a hearing on the appeal was held on 9 February 2004. In an opinion and award dated 30 November 2004, the Deputy Commissioner concluded that the treatment rendered by Drs. Jones, Suh, and Wheeless from 15 July 2003 to 24 September 2003 was emergency treatment reasonably necessary to give relief and effect a cure pursuant to N.C. Gen. Stat. § 97-25. The Deputy Commissioner also concluded that the treatment provided subsequent to 24 September 2003 was reasonably necessary to effect a cure or give relief for injuries proximately caused by the 8 October 2001 accident. Therefore, Defendants were ordered to pay for the referenced treatment. Defendants appealed to the Commission, which affirmed the opinion and award with minor modifications. The Commission also authorized Drs. Jones, Suh, and Wheeless as Plaintiff's treating physicians. Defendants appeal.

## II. Plaintiff's Motion to Dismiss as Interlocutory

[1] N.C. Gen. Stat. § 97-86 (2005) governs an appeal from an opinion and award of the Commission, and provides that any party to the dispute may "appeal from the decision of [the] Commission to the Court of Appeals for errors of law under the same terms and conditions as govern appeals from the superior court to the Court of Appeals in ordinary civil actions." "Parties have a right to appeal any final judgment of a superior court. Thus, an appeal of right arises only from a final order or decision of the Industrial Commission." *Ratchford v. C.C. Mangum, Inc.*, 150 N.C. App. 197, 199, 564 S.E.2d 245, 247 (2002) (citation omitted). Therefore, "[a] decision of the Industrial Commission is interlocutory if it determines one but not all of the issues in a workers' compensation case. A decision that on its face contemplates further proceedings or . . . does not fully dispose of the pending stage of the litigation is interlocutory." *Perry v. N.C. Dep't of Corr.*, 176 N.C. App. 123, 129, 625 S.E.2d 790, 794 (2006) (internal citations and quotation marks omitted). Even where a decision is interlocutory, however, immediate review of the issue is proper where the interlocutory decision affects a substantial right. *Id.* To qualify, the right affected must be substantial, and "the deprivation of that substantial right must potentially work injury if not corrected before appeal from a final judgment." *Id.*

In his motion to dismiss, Plaintiff argues that the appeal in the present case is interlocutory because "other hearings or appeals for the same or similar medical payment issues are possible in the future[.]" Thus, hearing the appeal will lead to the "yo-yo procedure"

which "works to defeat the very purpose of the Workers' Compensation Act." *Hardin v. Venture Construction Co.*, 107 N.C. App. 758, 761, 421 S.E.2d 601, 602-03 (1992). We disagree.

The opinion and award which is the subject of this appeal was filed following a full evidentiary hearing before a Deputy Commissioner, and was subsequently reviewed by the Commission. The award does not contemplate further proceedings, nor does it remand the matter to the Deputy Commissioner. Rather, the order resolves all issues surrounding the disputed medical treatment.

N.C. Gen. Stat. § 97-25 (2005) mandates that "[m]edical compensation shall be provided by the employer." The Workers' Compensation Act defines this term to include "medical, surgical, hospital, nursing, and rehabilitative services, and medicines, sick travel, and other treatment . . . as may reasonably be required to effect a cure or give relief[.]" N.C. Gen. Stat. § 97-2(19) (2005). Our Supreme Court has noted that

> the legislature always has provided for, and continues to provide for, two distinct components of an award under the Workers' Compensation Act: (1) payment for the cost of medical care, now denominated "medical compensation," which consists of payment of the employee's medical expenses incurred as a result of a job-related injury; and (2) general "compensation" for financial loss other than medical expenses, which includes payment to compensate for an employee's lost earning capacity and payment of funeral expenses.

*Hyler v. GTE Products Co.*, 333 N.C. 258, 267, 425 S.E.2d 698, 704 (1993). Thus, the Commission's determination that an employer must pay an injured employee medical compensation pursuant to N.C.G.S. § 97-25 is a separate determination from whether an employer owes compensation as a result of an employee's disability. Neither determination is a necessary prerequisite for the other. Therefore, the fact that the order Defendants appealed contains no determination of any wage compensation owed to Plaintiff does not render this appeal interlocutory.

We find further support for this conclusion in prior cases arising from disputes over payment of medical expenses under N.C.G.S. § 97-25. We are mindful that the language of N.C.G.S. § 97-25 has been amended since these cases were decided, but note that the amendments do not affect whether an appeal from an opinion and

award under this section is interlocutory. In *Bass v. Mecklenburg County*, 258 N.C. 226, 235, 128 S.E.2d 570, 576 (1962), our Supreme Court stated

> [i]t is our opinion, and we so hold, that when the Commission approves claimant's such bills, defendant shall then have a right on appeal to challenge the action of the Commission in respect to the bills approved by it, in whole or in part, if it deems it advisable to do so.

Further, in *Errante v. Cumberland County Solid Waste Management*, 106 N.C. App. 114, 121-22, 415 S.E.2d 583, 588 (1992), this Court said

> we note that in the case of a controversy arising between plaintiff and defendant relative to the continuance of medical treatment, the Industrial Commission is vested with the authority to order such further treatments as may in its discretion be necessary, N.C.G.S. § 97-25 (1991), and if the Commission approves a medical bill that in defendant's opinion is not compensable, then defendant at that time shall have a right and opportunity on appeal to challenge the Commission's decision.

Thus, we deny Plaintiff's motion to dismiss this appeal as interlocutory and review the merits of Defendants' appeal.

### III. Defendants' Substantive Appeal

[2] Our review in a workers' compensation case is limited to a determination of (1) whether the Commission's findings of fact are supported by any competent evidence in the record; and (2) whether the Commission's findings justify its conclusions of law. *Deese v. Champion Int'l Corp.*, 352 N.C. 109, 116, 530 S.E.2d 549, 553 (2000). Where the Commission's findings are supported by competent evidence, those findings are conclusive even if there is evidence to support a contrary finding. *Jones v. Candler Mobile Village*, 118 N.C. App. 719, 721, 457 S.E.2d 315, 317 (1995). We first note that although Defendants assign error to several of the Commission's findings of fact, Defendants do not support these assignments of error with arguments in their brief. We deem these assignments of error abandoned. N.C.R. App. P. 28(b)(6) ("Assignments of error not set out in the appellant's brief . . . will be taken as abandoned."). As a result, the Commission's findings of fact are binding on this Court. *Wooten v. Newcon Transp., Inc.*, 178 N.C. App. 698, 701, 632 S.E.2d 525, 528

(2006). Our review is limited to whether the Commission's findings of fact justify the following conclusions of law:

> 1. The treatment received by [P]laintiff at North Carolina Spine Center prior to the Industrial Commission order of July 21, 2003, was reasonably necessary under the circumstances and constitutes an emergency as defined by N.C. Gen. Stat. § 97-25.

> 2. The Industrial Commission Order of July 21, 2003, provided that [D]efendants shall authorize and pay for [P]laintiff's treatment as recommended by Dr. Siegel. On September 24, 2003, Dr. Siegel recommended treatment for [P]laintiff with Dr. Jones, Dr. Suh, and Dr. Wheeless. On or after September 24, 2003, [D]efendants had not provided any other orthopedic treatment or options to Plaintiff. Pursuant to Industrial Commission order July 21, 2003, treatment subsequent to September 24, 2003 provided by Dr. Jones, Dr. Suh, and Dr. Wheeless, as recommended by Dr. Siegel, should be paid for by [D]efendants.

> 3. The treatment provided to [P]laintiff, at North Carolina Spine Center from Dr. Jones and Dr. Suh, and the treatment provided by Dr. Wheeless for [P]laintiff's left knee was necessary to effect a cure and give relief. N.C. Gen. Stat. § 97-25.

We find the Commission's conclusions of law to be supported by its findings of fact, and therefore affirm the Commission's opinion and award.

Defendants challenge the Commission's conclusion that "the treatment received by Plaintiff at the North Carolina Spine Center prior to the Industrial Commission order of July 21, 2003, was reasonably necessary under the circumstances and constituted an emergency as defined by N.C. Gen. Stat. § 97-25."

Pursuant to N.C. Gen. Stat. § 97-25 (2005),

> If in an emergency on account of the employer's failure to provide the medical or other care as herein specified a physician other than provided by the employers is called to treat the injured employee the reasonable cost of such service shall be paid by the employer, if so ordered by the Industrial Commission.

Our courts have concluded an employee is justified "in seeking another physician in an emergency where the employer's failure to provide medical services amounts merely to an inability to provide

those services." *Schofield v. Tea Co.*, 299 N.C. 582, 588, 264 S.E.2d 56, 61 (1980) (emphasis omitted). Further, "an injured employee has the right to procure, even in the absence of an emergency, a physician of his own choosing, subject to the approval of the Commission." *Id.* at 591, 264 S.E.2d at 64.

At the time that Plaintiff sought treatment at the North Carolina Spine Center, he had been discharged from Dr. Dimmig's care. Yet, Dr. Siegel recommended additional orthopedic evaluation, and Plaintiff still reported pain. When Defendants refused the care recommended by Dr. Siegel, Plaintiff moved the Commission for an order compelling Defendants to provide further care. Thus, Plaintiff sought authorization from the Commission prior to obtaining care on his own. Plaintiff did not seek care on his own until 15 July 2003, more than three months after being discharged by Dr. Dimmig, and after receiving no further orthopedic treatment, despite continued pain. Further, the Commission's findings as to the nature of the emergency were sufficient. The duration of the emergency is clear (the treatment provided by Drs. Jones, Suh, and Wheeless from 15 July 2003 to 24 September 2003) and the Commission concluded the care was "reasonably necessary under the circumstances." *See Schofield*, 299 N.C. at 594, 264 S.E.2d at 64.

Defendants next challenge the Commission's conclusion that Defendants must pay for the medical treatment provided by Drs. Jones, Suh, and Wheeless subsequent to 24 September 2003 pursuant to the 21 July 2003 order. The Commission's 21 July 2003 order mandated that Defendants authorize and pay for the treatment recommended by Dr. Siegel. Dr. Siegel referred Plaintiff to Drs. Jones, Suh, and Wheeless on 24 September 2003. Pursuant to the 21 July 2003 order, Defendants were responsible for this treatment.

Finally, Defendants argue that the Commission erred when it concluded that the treatment provided by Drs. Jones, Suh, and Wheeless was necessary to effect a cure and give relief. Defendants argue this additional treatment provided by Drs. Jones, Suh, and Wheeless was not related to the compensable injury, and therefore Defendants were not responsible for this treatment. We disagree.

Medical treatment awarded pursuant to N.C. Gen. Stat. § 97-25 must be "directly related to the original compensable injury." *Pittman v. Thomas & Howard*, 122 N.C. App. 124, 130, 468 S.E.2d 283, 286, *disc. review denied*, 343 N.C. 513, 472 S.E.2d 18 (1996). "If additional medical treatment is required, there arises a rebuttable presumption

that the treatment is directly related to the original compensable injury and the employer has the burden of producing evidence showing the treatment is not directly related to the compensable injury." *Reinninger v. Prestige Fabricators, Inc.*, 136 N.C. App. 255, 259, 523 S.E.2d 720, 723 (1999). Defendants argue that the testimony of Dr. Dimmig that Plaintiff had reached maximum medical orthopedic improvement, and Dr. Newman's diagnosis of conversion disorder show the treatment was not related to the compensable injury. Plaintiff points us to the opinion of Dr. Siegel, who traced Plaintiff's orthopedic problems to the 8 October 2001 accident. Defendants ask us to resolve a credibility issue, which is not our role. *Anderson v. Lincoln Construction Co.*, 265 N.C. 431, 434, 144 S.E.2d 272, 274 (1965) ("The Commission is the sole judge of the credibility of the witnesses and the weight to be given their testimony.").

Affirmed.

Judges WYNN and McCULLOUGH concur.